1  ALAN R. BRAYTON, ESQ., S.B. #73685
   DAVID R. DONADIO, ESQ., S.B. #154436
2  BRAYTON❖PURCELL LLP
   Attorneys at Law
3  222 Rush Landing Road
   P.O. Box 6169
4  Novato, California  94948-6169
   (415) 898-1555
5  (415) 898-1247 (Fax No.)

6  Attorneys for Plaintiffs

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION

11  JUDITH STANTON, as Wrongful Death      )   No. _____
    Heir, and as Successor-in-Interest to   )
12  RONNIE STANTON, Deceased, and           )
    SCOTT STANTON and VICKI                 )
13  ZAMMITO as Wrongful Death Heirs to      )   COMPLAINT FOR SURVIVAL,
    RONNIE STANTON, Deceased, and           )   WRONGFUL DEATH - ASBESTOS;
14  AMY STANTON as Successor-In-Interest    )   DEMAND FOR JURY TRIAL
    to RONNIE STANTON, JR., Deceased, as    )
15  Legal Heir of RONNIE STANTON,           )
    Deceased,                               )
16                                          )
                                            )
17              Plaintiffs,                 )
                                            )
18  vs.                                     )
                                            )
19  METROPOLITAN LIFE INSURANCE             )
    COMPANY,                                )
20                                          )
                Defendant.                  )
21  _____)

22                      I.

23                   PARTIES

24     1.    Plaintiffs in this action are the above-captioned successor-in-interest to, or the

25  personal representative of the estate of Decedent; and the personal representatives on behalf of

26  the legal heirs, or the heirs-at-law, of the Decedent, and are all hereinafter referred to as

27  "Plaintiffs."

28     2.    The person who sustained asbestos-related lung injuries and death as a result of

BRAYTON❖PURCELL LLP
ATTORNEYS AT LAW
222 RUSH LANDING ROAD
P O BOX 6169
NOVATO, CALIFORNIA 94948-6169
(415) 898-1555

1  their inhalation of asbestos fibers through the person's occupational exposure to asbestos,
2  hereinafter "Decedent" is, with the date of death: RONNIE STANTON died June 4, 2013.
3  JUDITH STANTON is the spouse of RONNIE STANTON and is hereinafter referred to as
4  "surviving spouse."

5      3.      Decedent sustained an asbestos-related lung disease and death by precisely the
6  following mechanism: the inhalation of asbestos fibers released during the handling of asbestos-
7  containing products at Decedent's jobsites. The pathogenesis of Decedent's asbestos-related
8  diseases is explained on **Exhibit A**, attached to Plaintiffs' complaint and incorporated by
9  reference herein.

10      4.      All of Plaintiffs' claims arise out of a similar series of occurrences: repeated
11  exposure to asbestos-containing products manufactured, distributed, and/or sold by defendants
12  and supplied to, installed and/or maintained by defendants at Decedent's worksites, over a period
13  of years, caused from release of toxic asbestos fibers and subsequent inhalation by the Decedent,
14  resulting in cumulative, progressive, incurable lung diseases.

15      5.      Each Plaintiff claims damages for an asbestos-related disease arising from an
16  identical series of occurrences not dependent on Decedent's worksite but on the fact that
17  asbestos-containing products, when handled in the manner in which they were intended, released
18  harmful asbestos fibers which when inhaled by Decedent, caused serious lung disease. The
19  allegations of Plaintiffs regarding the nature of Decedent's asbestos-related diseases, the nature
20  of asbestos; the propensity of asbestos to cause disease, the criteria for diagnosis of disease, are
21  all identical.

22      6.      Plaintiffs are informed and believe, and thereon allege, that at all times herein
23  mentioned, defendants were and are corporations, partnerships, unincorporated associations, sole
24  proprietorships and/or other business entities organized and existing under and by virtue of the
25  laws of the State of California, or the laws of some other state or foreign jurisdiction, and that
26  said defendants, and each of them, were and are authorized to do and are doing business in the
27  State of California, and that said defendants have regularly conducted business in the State of
28  California.

1

## II.

2

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

3      7.      Jurisdiction: Plaintiff JUDITH STANTON is a citizen of the State of

4 Massachusetts. Plaintiff(s) SCOTT STANTON, VICKI ZAMMITO, AMY STANTON are

5 citizens of the following states, respectively: Massachusetts; Massachusetts, Massachusetts.

6      Defendants are each corporations incorporated under the laws of and having its principal

7 places of business in the following States:

8

| DEFENDANT | STATE |
|---|---|
| METROPOLITAN LIFE INSURANCE COMPANY | New York/New York |

9

10

11      This Court has original jurisdiction under 28 U.S.C. § 1332, in that it is a civil action

12 between citizens of different states in which the matter in controversy exceeds, exclusive of costs

13 and interest, seventy-five thousand dollars.

14      8.      Venue / Intradistrict Assignment.  Venue is proper in the Northern District of

15 California and assignment to the San Francisco Division of said district is proper as a substantial

16 part of the events or omissions which give rise to the claims asserted by Plaintiffs herein

17 occurred within the County of San Francisco, California, and Defendants are subject to personal

18 jurisdiction in this district at the time the action is commenced.

19

## III.

20

## CAUSES OF ACTION

21

### FIRST CAUSE OF ACTION
(Negligence - Survival)

22

23      PLAINTIFF JUDITH STANTON AS SUCCESSOR-IN-INTEREST TO THE

24 DECEDENT RONNIE STANTON COMPLAINS OF DEFENDANTS METROPOLITAN LIFE

25 INSURANCE COMPANY, THEIR "ALTERNATE ENTITIES," AND EACH OF THEM, AND

26 FOR A CAUSE OF ACTION FOR NEGLIGENCE ALLEGES:

27      9.      At all times herein mentioned, each of the named defendants was the successor,

28 successor in business, successor in product line or a portion thereof, assign, predecessor,

1  predecessor in business, predecessor in product line or a portion thereof, parent, holding

2  company, affiliate, venturer, co-venturer, subsidiary, wholly or partially owned by, or the whole

3  or partial owner of or member in an entity researching, studying, manufacturing, fabricating,

4  designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale,

5  supplying, selling, inspecting, testing, authorizing, approving, certifying, facilitating, promoting,

6  representing, endorsing servicing, installing, contracting for installation, repairing, marketing,

7  warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or

8  otherwise directing and/or facilitating the use of, or advertising a certain product, namely

9  asbestos, and/or other products containing asbestos. Said entities shall hereinafter collectively be

10  called ALTERNATE ENTITIES. Each of the herein named defendants is liable for the tortious

11  conduct of each successor, successor in business, successor in product line or a portion thereof,

12  assign, predecessor in product line or a portion thereof, parent, holding company, affiliate,

13  venturer, co-venturer, subsidiary, whole or partial owner, or wholly or partially owned entity, or

14  entity that it was a member of, or funded, that researched, studied, manufactured, fabricated,

15  designed, modified, labeled, assembled, distributed, leased, bought, offered for sale, supplied,

16  sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted,

17  rebranded, manufactured for others and advertised a certain product, namely asbestos, and other

18  products containing asbestos. Said defendants, and each of them, are liable for the acts of each

19  and every ALTERNATE ENTITY, and each of them, in that there has been a virtual destruction

20  of Plaintiffs' remedy against each such ALTERNATE ENTITY; defendants, and each of them,

21  have acquired the assets, product line, or a portion thereof, of each such ALTERNATE ENTITY;

22  defendants, and each of them, caused the destruction of Plaintiffs' remedy against each such

23  ALTERNATE ENTITY; each such defendant has the ability to assume the risk-spreading role of

24  each such ALTERNATE ENTITY; and that each such defendant enjoys the goodwill originally

25  attached to each such ALTERNATE ENTITY.

26         10.    At all times herein mentioned, defendants, their ALTERNATE ENTITIES, and

27  each of them, were and are engaged in the business of researching, manufacturing, fabricating,

28  designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale,

1   supplying, selling, inspecting, endorsing, testing, authorizing, approving, certifying, facilitating,

2   promoting, representing, servicing, installing, contracting for installation, repairing, marketing,

3   warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or

4   otherwise directing and/or facilitating the use of, or advertising a certain product, namely

5   asbestos and other products containing asbestos.

6        11.   At all times herein mentioned, defendants, their ALTERNATE ENTITIES and

7   each of them, singularly and jointly, negligently, and carelessly researched, manufactured,

8   fabricated, designed, modified, tested or failed to test, abated or failed to abate, warned or failed

9   to warn of the health hazards, labeled, assembled, distributed, leased, bought, offered for sale,

10   supplied, sold, inspected, serviced, authorized, approved, certified, facilitated, promoted,

11   installed, represented, endorsed, contracted for installation of, repaired, marketed, warranted,

12   rebranded, manufactured for others, packaged and advertised, a certain product, namely asbestos,

13   and other products containing asbestos, in that said products caused personal injuries to users,

14   consumers, workers, bystanders and others, including the Decedent herein, (hereinafter

15   collectively called "exposed persons"), while being used in a manner that was reasonably

16   foreseeable, thereby rendering said products hazardous, unsafe, and dangerous for use by

17   "exposed persons."

18        12.   Defendants, their ALTERNATE ENTITIES, and each of them, had a duty to

19   exercise due care in the pursuance of the activities mentioned above and defendants, and each of

20   them, breached said duty of due care.

21        13.   Defendants, their ALTERNATE ENTITIES and each of them, knew, or should

22   have known, and intended that the aforementioned asbestos and products containing asbestos and

23   related products and equipment, would be transported by truck, rail, ship, and other common

24   carriers, that in the shipping process the products would break, crumble, or be otherwise

25   damaged; and/or that such products would be used for insulation, construction, plastering,

26   fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not

27   limited to unpacking, preparing, using, sawing, drilling, chipping, hammering, scraping, sanding,

28   breaking, removing, maintaining, inspecting, "rip-out," and other manipulation, resulting in the

1   release of airborne asbestos fibers, and that through such foreseeable use and/or handling
2   "exposed persons," including Decedent herein, would use or be in proximity to and exposed to
3   said asbestos fibers, which contaminated the packaging, products, environment, and clothing of
4   persons working in proximity to said products, directly or through reentrainment.

5       14.    Decedent had used, handled, or been otherwise exposed to asbestos and asbestos-
6   containing products referred to herein in a manner that was reasonably foreseeable. Decedent's
7   exposure to asbestos and asbestos-containing products is on current information as set forth at
8   various locations and circumstances in **Exhibit A,** attached hereto and incorporated by reference
9   herein.

10       15.    As a direct and proximate result of the acts, omissions, and conduct of the
11   defendants, their ALTERNATE ENTITIES, and each of them, as aforesaid, Decedent's exposure
12   to asbestos and asbestos-containing products caused severe and permanent injury, damage, loss,
13   or harm to the Decedent as set forth in **Exhibit A**, attached to Plaintiffs' complaint and
14   incorporated by reference herein.

15       16.    Plaintiffs are informed and believe, and thereon allege, that progressive lung
16   disease, cancer, and other serious diseases are caused by inhalation or ingestion of asbestos fibers
17   without perceptible trauma and that said injury, damage, loss, or harm results from exposure to
18   asbestos and asbestos-containing products over a period of time.

19       17.    Decedent suffered from a condition related to exposure to asbestos and asbestos-
20   containing products. Decedent was not aware at the time of exposure that asbestos or asbestos-
21   containing products presented any risk of injury and/or disease.

22       18.    As a direct and proximate result of the aforesaid conduct of the defendants, their
23   "alternate entities," and each of them, Decedent incurred liability for physicians, surgeons,
24   nurses, hospital care, medicine, hospices, X-rays and other medical treatment, the true and exact
25   amount thereof being unknown to Plaintiffs at this time, and Plaintiffs pray leave to amend this
26   complaint accordingly when the true and exact cost thereof is ascertained.

27       19.    As a direct and proximate result of the aforesaid conduct of the defendants, their
28   ALTERNATE ENTITIES, and each of them, Decedent incurred liability for the reasonable value

1 of medial care provided by Decedent's family members measured by, inter alia, the costs

2 associated with the hiring a registered nurse, home hospice, or other service provider, the true

3 and exact amount thereof being unknown to Plaintiffs at this time, and Plaintiffs pray leave to

4 amend this complaint accordingly when the true and exact costs are known or at time of trial.

5      20.     As a direct and proximate result of the aforesaid conduct of defendants, their

6 ALTERNATE ENTITIES, and each of them, Decedent suffered permanent injuries to his person,

7 body, and health, including, but not limited to, asbestosis, other lung damage, and cancer and

8 related sequelae, and the mental and emotional distress attendant thereto, and ultimately death,

9 from the effect of exposure to asbestos fibers, all to his general damage in the sums to be proven

10 at trial.

11      21.     As a further direct and proximate result of the said conduct of the defendants,

12 their ALTERNATE ENTITIES, and each of them, Decedent incurred loss of income, benefits,

13 entitlements, wages, profits, and commissions, a diminishment of earning potential, and other

14 pecuniary losses, the full nature and extent of which are not yet known to Plaintiffs; and leave is

15 requested to amend this complaint to conform to proof at the time of trial.

16      22.     As a further direct and proximate result of the said conduct of the defendants,

17 their ALTERNATE ENTITIES, and each of them, Decedent's exposure to asbestos and asbestos-

18 containing products caused severe and permanent injury to Decedent, and ultimately Decedent

19 died on the date previously stated herein.

20      23.     Defendants, their ALTERNATE ENTITIES, and each of them, and their officers,

21 directors and managing agents participated in, authorized, expressly and impliedly ratified, and

22 had full knowledge of, or should have known of, each of the acts set forth herein.

23      24.     Defendants, their ALTERNATE ENTITIES, and each of them, are liable for the

24 fraudulent, oppressive, and malicious acts of their ALTERNATE ENTITIES, and each of them,

25 and each defendant's officers, directors, and managing agents participated in, authorized,

26 expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of

27 each of their ALTERNATE ENTITIES as set forth herein.

28      WHEREFORE, Plaintiffs pray judgment against defendants, their "alternate entities," and

1   each of them, as hereinafter set forth.

2                              SECOND CAUSE OF ACTION
                               (Products Liability - Survival)
3

4        PLAINTIFF JUDITH STANTON AS SUCCESSOR-IN-INTEREST TO THE

5   DECEDENT RONNIE STANTON COMPLAINS OF DEFENDANTS METROPOLITAN LIFE

6   INSURANCE COMPANY, THEIR "ALTERNATE ENTITIES,"AND EACH OF THEM;

7   EACH FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION

8   FOR PRODUCTS LIABILITY (SURVIVAL), COMPLAIN AS FOLLOWS:

9        25.    Plaintiffs incorporate herein by reference, as though fully set forth herein, each

10  paragraph of the First Cause of Action herein.

11       26.    Defendants, their "alternate entities," and each of them, knew and intended that

12  the above-referenced asbestos and asbestos-containing products would be used by the purchaser

13  or user without inspection for defects therein or in any of their component parts and without

14  knowledge of the hazards involved in such use.

15       27.    Said asbestos and asbestos-containing products were defective and unsafe for their

16  intended purpose in that the inhalation or ingestion of asbestos fibers causes serious disease

17  and/or death. The defect existed in the said products at the time they left the possession of

18  defendants, their ALTERNATE ENTITIES, and each of them. Said products did, in fact, cause

19  personal injuries, including asbestosis, other lung damage, cancer, and death to "exposed

20  persons," including Decedent herein, while being used in a reasonably foreseeable manner,

21  thereby rendering the same defective, unsafe, and dangerous for use.

22       28.    "Exposed persons" did not know of the substantial danger of using said products.

23  Said dangers were not readily recognizable by "exposed persons." Said defendants, their

24  ALTERNATE ENTITIES, and each of them, further failed to adequately warn of the risks to

25  which Decedent and others similarly situated were exposed.

26       29.    In researching, manufacturing, fabricating, designing, modifying, testing or failing

27  to test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for

28  sale, supplying, selling, inspecting, testing, authorizing, approving, certifying, facilitating,

K:\Injured\108485\FED\Pld\cmp wd fed wpd                8

1 promoting, representing, endorsing servicing, installing, contracting for installation, repairing,
2 marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos
3 and asbestos-containing products, defendants, their ALTERNATE ENTITIES, and each of them,
4 did so with conscious disregard for the safety of "exposed persons" who came in contact with
5 said asbestos and asbestos-containing products, in that said defendants, their ALTERNATE
6 ENTITIES, and each of them, had prior knowledge that there was a substantial risk of injury or
7 death resulting from exposure to asbestos or asbestos-containing products, including, but not
8 limited to, asbestosis, other lung damages, and cancer. Said knowledge was obtained, in part,
9 from scientific studies performed by, at the request of, or with the assistance of, said defendants,
10 their ALTERNATE ENTITIES, and each of them, and which knowledge was obtained by said
11 defendants, their ALTERNATE ENTITIES, and each of them on or before 1930, and thereafter.

12    30.    On or before 1930, and thereafter, said defendants, their ALTERNATE
13 ENTITIES and each of them, were aware that members of the general public and other "exposed
14 persons," who would come in contact with their asbestos and asbestos-containing products, had
15 no knowledge or information indicating that asbestos or asbestos-containing products could
16 cause injury, and said defendants, their ALTERNATE ENTITIES, and each of them, knew that
17 members of the general public and other "exposed persons," who came in contact with asbestos
18 and asbestos-containing products, would assume, and in fact did assume, that exposure to
19 asbestos and asbestos-containing products was safe, when in fact said exposure was extremely
20 hazardous to health and human life.

21    31.    With said knowledge, said defendants, their ALTERNATE ENTITIES, and each
22 of them, opted to research, manufacture, fabricate, design, modify, label, assemble, distribute,
23 lease, buy, offer for sale, supply, sell, inspect, service, install, contract for installation, repair,
24 market, warrant, rebrand, manufacture for others, package and advertise said asbestos and
25 asbestos-containing products without attempting to protect "exposed persons" from, or warn
26 "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and
27 asbestos-containing products. Rather than attempting to protect "exposed persons" from, or warn
28 "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and

1 asbestos-containing products, defendants, their ALTERNATE ENTITIES, and each of them,
2 intentionally failed to reveal their knowledge of said risk, and consciously and actively concealed
3 and suppressed said knowledge from "exposed persons" and members of the general public, thus
4 impliedly representing to "exposed persons" and members of the general public that asbestos and
5 asbestos-containing products were safe for all reasonably foreseeable uses. Defendants, their
6 ALTERNATE ENTITIES, and each of them, engaged in this conduct and made these implied
7 representations with the knowledge of the falsity of said implied representations.

8      32.     The above-referenced conduct of said defendants, their ALTERNATE ENTITIES,
9 and each of them, was motivated by the financial interest of said defendants, their ALTERNATE
10 ENTITIES, and each of them, in the continuing, uninterrupted research, design, modification,
11 manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer for sale, supply,
12 sale, inspection, installation, contracting for installation, repair, marketing, warranting,
13 rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or otherwise
14 directing and/or facilitating the use of, or advertising of asbestos and asbestos-containing
15 products. In pursuance of said financial motivation, said defendants, their ALTERNATE
16 ENTITIES, and each of them, consciously disregarded the safety of "exposed persons" and in fact
17 were consciously willing and intended to permit asbestos and asbestos-containing products to
18 cause injury to "exposed persons" and induced persons to work with and be exposed thereto,
19 including Decedent.

20      33.     Plaintiffs allege that the aforementioned defendants, their ALTERNATE
21 ENTITIES, and each of them impliedly warranted their asbestos and asbestos-containing
22 products, to be safe for their intended use, but that their asbestos and asbestos-containing
23 products, created an unreasonable risk of bodily harm to exposed persons.

24      34.     Plaintiffs relied upon defendants', their ALTERNATE ENTITIES, and each of
25 their representations, lack of warnings, and implied warranties of fitness of asbestos and their
26 asbestos-containing products. As a direct, foreseeable, and proximate result thereof, Decedent
27 suffered permanent injury and death as alleged herein.

28      35.     As a direct and proximate result of the actions and conduct outlined herein,

1  Decedent have suffered the injuries and damages herein alleged.

2      WHEREFORE, Plaintiffs pray judgment against defendants, their "alternate entities", and

3  each of them, as hereinafter set forth.

4  THIRD CAUSE OF ACTION<br>(Negligence - Wrongful Death)

5

6      PLAINTIFF JUDITH STANTON, AS WRONGFUL DEATH HEIR, AND AS

7  SUCCESSOR-IN-INTEREST TO RONNIE STANTON DECEASED, AND PLAINTIFF(S)

8  SCOTT STANTON AND VICKI ZAMMITO, AS WRONGFUL DEATH HEIRS TO RONNIE

9  STANTON, DECEASED, AND AMY STANTON AS SUCCESSOR-IN-INTEREST TO

10  LEGAL HEIR RONNIE STANTON, JR., DECEASED, COMPLAIN OF DEFENDANTS

11  METROPOLITAN LIFE INSURANCE COMPANY, THEIR "ALTERNATE ENTITIES," AND

12  EACH OF THEM; EACH FOR A THIRD, SEPARATE, FURTHER AND DISTINCT CAUSE

13  OF ACTION FOR NEGLIGENCE (WRONGFUL DEATH), COMPLAIN AS FOLLOWS:

14      36.    Plaintiffs incorporate by reference each paragraph contained within the First and

15  Second Cause of Action as though fully set forth herein.

16      37.    The heirs at law of the Decedent and their relationship to the Decedent is set forth

17  below:

18  NAME:                         RELATIONSHIP TO DECEDENT:

| NAME: | RELATIONSHIP TO DECEDENT: |
|---|---|
| JUDITH STANTON | Spouse |
| RONNIE STANTON, JR., deceased | Son |
| SCOTT STANTON | Son |
| VICKI ZAMMITO | Daughter |

22      38.    The individuals set forth as heirs constitute all of the surviving heirs of the

23  Decedent.

24      39.    As a direct and proximate result of the conduct of the defendants, their

25  ALTERNATE ENTITIES, and each of them, as aforesaid, the exposure to asbestos and asbestos-

26  containing products caused Decedent to develop diseases from which condition Decedent died.

27  Plaintiffs were unaware that the death caused by asbestos-related disease until within one year of

28  filing the complaint.

K:\Injured\108485\FED\Pld\cmp wd fed.wpd            11

40. At all times prior to his death, Decedent was a faithful and dutiful spouse to the surviving spouse.

41. As a direct and proximate result of the conduct of defendants, and each of them, and the death of Decedent, Decedent's heirs have sustained pecuniary loss resulting from the loss of care, society, comfort, attention, services, and support of Decedent all to the damage of Decedent's heirs.

42. As a further direct and proximate result of the conduct of defendants, and each of them, and the death of Decedent, Decedent's heirs have incurred funeral expenses in an amount currently not ascertained.

WHEREFORE, Plaintiffs pray judgment against defendants, and each of them, as hereinafter set forth.

FOURTH CAUSE OF ACTION
(Products Liability - Wrongful Death)

PLAINTIFF JUDITH STANTON, AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO RONNIE STANTON DECEASED, AND PLAINTIFF(S) SCOTT STANTON AND VICKI ZAMMITO, AS WRONGFUL DEATH HEIRS TO RONNIE STANTON, DECEASED, AND AMY STANTON AS SUCCESSOR-IN-INTEREST TO LEGAL HEIR RONNIE STANTON, JR., DECEASED, COMPLAIN OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, THEIR "ALTERNATE ENTITIES," AND EACH OF THEM; EACH FOR A FOURTH, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR PRODUCTS LIABILITY (WRONGFUL DEATH), COMPLAIN AS FOLLOWS:

43. Plaintiffs incorporate herein by reference, as though fully set forth herein, each paragraph of the First, Second and Third Causes of Action herein.

44. As a direct and proximate result of the conduct of defendants, and each of them, Decedent's heirs have sustained the injuries and damages previously alleged.

WHEREFORE, Plaintiffs pray judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

1

FIFTH CAUSE OF ACTION
Aiding and Abetting Battery
[Against Metropolitan Life Insurance Company]

2

3       AS AND FOR A FURTHER, FIFTH, SEPARATE AND DISTINCT CAUSE OF

4   ACTION FOR AIDING AND ABETTING BATTERY, PLAINTIFF COMPLAINS OF

5   DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, THEIR ALTERNATE

6   ENTITIES AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

7       45.     Plaintiff incorporates herein by reference, as though fully set forth hereat, each

8   and every allegation of the First and Second Causes of Action as though fully set forth herein.

9   (As used throughout this cause of action, "plaintiff" refers to all named plaintiffs and/or all

10   named decedents from whom the named plaintiffs' injuries may derive.)

11       46.     This cause of action is for the aiding and abetting of battery by METROPOLITAN

12   LIFE INSURANCE COMPANY ("MET LIFE"), primarily through its assistant medical director

13   Anthony Lanza, M.D., of a breach of duty committed by Johns-Manville Corporation ("J-M").

14       47.     Plaintiff is informed and believes, and thereon alleges, that at all times herein

15   mentioned defendant MET LIFE was and is a corporation organized and existing under and by

16   virtue of the laws of the State of New York or the laws of some other state or foreign jurisdiction,

17   and that this defendant was and is authorized to do and/or was and is doing business in the State

18   of California, and regularly conducted or conducts business in the County of San Francisco, State

19   of California. At times relevant to this cause of action, MET LIFE was an insurer of J-M.

20       48.     Decedent was exposed to asbestos-containing dust created by the use of the

21   asbestos products manufactured, distributed and/or supplied by J-M. This exposure to the

22   asbestos or asbestos-related products supplied by J-M caused decedent's asbestos-related disease

23   and injuries.

24       49.     Starting in 1928, MET LIFE sponsored studies of asbestos dust and asbestos-

25   related disease in Canadian mines and mills, including those of J-M. Those studies revealed that

26   miners and mill workers were contracting asbestosis at relatively low levels of dust. McGill

27   University, which conducted the studies, sought permission from MET LIFE to publish the

28   results but they were never published. MET LIFE prepared its own report of these studies.

1    50.    Between 1929 and 1931, MET LIFE studied dust levels and disease at five U.S.

2  plants manufacturing asbestos-containing products, including a J-M plant. Those studies showed

3  that workers in substantial numbers were contracting asbestosis, at levels less than what became

4  the Threshold Limit Value ('TLV") of 5mppcf. The MET LIFE report was never published or

5  disseminated except to plant owners, including J-M.

6    51.    In 1932, MET LIFE studied dust levels and disease at the J-M plant at Manville,

7  New Jersey. Results were consistent with those of the Canadian and previous U.S. plant studies.

8  They were never published.

9    52.    In 1934, J-M and others whose plants MET LIFE had studied agreed with MET

10  LIFE that it should issue a report of its studies.

11    53.    MET LIFE submitted a draft of its report to J-M. J-M requested, for legal and

12  business reasons, that certain critical parts of the draft be changed. MET LIFE's official in

13  charge was Lanza. MET LIFE through Lanza did make changes that J-M requested, including:

14        (a)    Deletion of MET LIFE's conclusion that the permissible dust level for

15             asbestos should be less than that for silica;

16        (b)    Addition of the phrase that asbestosis clinically appeared to be milder than

17             silicosis.

18  The report, thus altered, was published in 1935. It was misleading, and intentionally so, because

19  it conveyed the incorrect propositions that asbestosis was a less serious disease process than

20  silicosis and that higher levels of asbestos dust could be tolerated without contracting diseases

21  than was the case for silica dust.

22    54.    MET LIFE had a close relationship with J-M. It invested money in J-M. It

23  provided group health and life insurance to J-M. MET LIFE IN 1934 agreed to supply industrial

24  hygiene services to J-M, including dust counts, training employees to monitor dust levels,

25  examining employees, and recommending protective equipment. MET LIFE and Lanza were

26  viewed as experts on industrial dusts.

27    55.    In 1933, MET LIFE through Lanza issued the following advice to J-M:

28        (a)    Disagreeing with the recommendation of a J-M plant physician, MET

K:\Injured\108485\FED\Pld\cmp wd fed.wpd                14

1                  LIFE advised against warning workers of the fact that asbestos dust is

2                  hazardous to their health, basing its advice in view of the extraordinary

3                  legal situation;

4        (b)     When the plant physician judged the best disposition of an employee with

5                  asbestosis was to remove him from the dust, MET LIFE advised instead

6                  that disposition should depend on his age, nature of work and other factors

7                  and to leave him alone if he is old and showing no disability, for, MET

8                  LIFE stated, economic and production factors must be balanced against

9                  medical factors.

10    56.     J-M followed the MET LIFE advices and did not warn its workers, including

11   plaintiff, of the hazards of asbestos dust, and J-M also intentionally refrained from notifying

12   workers of their disease.

13    57.     In 1936, MET LIFE, J-M and others founded the Air Hygiene Foundation

14   ("AHF"). One of the AHF purposes was to develop standards for dust levels that would serve as

15   a defense in lawsuits and workers' compensation claims.

16    58.     MET LIFE funded partially another study that tentatively recommended in 1938 a

17   TLV for asbestos dust of 5mpccf, the same as for silica dust. MET LIFE was aware of data from

18   its own, unpublished reports that showed that level was too high for asbestos dust. MET LIFE

19   nonetheless promoted that TLV as proper.

20    59.     In June 1947, the Industrial Hygiene Foundation ("IHF") which succeeded to the

21   AHF, issued a report of studies by Dr. Hemeon of U.S. asbestos plants, including a J-M plant.

22   That report showed that workers exposed to less than the recommended maximum levels of dust

23   were developing disease. MET LIFE was a member of the IHF and Lanza was on its medical

24   committee. The Hemeon report, which was supplied to J-M and other owners, never was

25   published.

26    60.     In 1936, J-M and other asbestos companies agreed with a leading medical

27   research facility, Saranac Laboratories, that Saranac would research asbestos disease, but J-M

28   and the others retained control over publication of the results. In 1943 Saranac's Dr. Leroy

COMPLAINT FOR SURVIVAL, WRONGFUL DEATH - ASBESTOS; DEMAND FOR JURY TRIAL

1  Gardner, in charge of the research, sent a draft to J-M that revealed that 81.8% of mice exposed
2  to long fiber asbestos contracted cancer.

3      61.    Dr. Gardner died in 1946. J-M and other companies wanted parts of the Saranac
4  results published and enlisted the assistance of MET LIFE's Lanza. J-M and other companies
5  decided that Saranac's findings of cancer caused by asbestos in mice must be deleted, as well as
6  Saranac's critique of existing dust standards. Lanza directed Saranac to delete the offending
7  materials. Saranac did so, and the altered report was published in 1951 by Saranac's Dr.
8  Vorwald, in the *AMA Archives of Industrial Hygiene.*

9      62.    Lanza left MET LIFE at the end of 1948, and took a position at New York
10  University, funded by MET LIFE. He continued to misrepresent that asbestos does not cause
11  cancer into the 1950s.

12      63.    The IHF (formerly AHF), of which MET LIFE was a member and MET LIFE
13  official was on its medical committee, through Drs. Braun and Truan conducted a study of
14  Canadian miners. The original report, in 1957, found an increased incidence of lung cancer in
15  persons exposed to asbestos. The sponsors, including J-M, caused those findings to be stricken,
16  and the report published in 1958 contained the false conclusion that asbestos exposure alone did
17  not increase the risk of lung cancer.

18      64.    The false and misleading reports that a link between asbestos exposure and cancer
19  was not proven influenced the TLV, for if a substance causes cancer the TLV must be very low
20  or zero.

21      65.    J-M not later than 1933 was inflicting asbestos dust on its workers in its plants
22  knowing that the dust was hazardous and was causing workers to contract disease that could and
23  would disable and kill them. As MET LIFE advised, J-M did not warn its workers of the hazard.
24  J-M committed battery on workers in its plants, including plaintiff, by that conduct.

25      66.    MET LIFE knew that J-M's conduct constituted a breach of its duties to its
26  workers. MET LIFE gave substantial assistance to J-M in committing batteries on its workers,
27  including plaintiff, through MET LIFE's conduct described above, including by:

28          (a)    Affirmatively urging J-M not to warn workers of the hazards of asbestos

K:\Injured\108485\FED\Pld\cmp wd fed.wpd          16
COMPLAINT FOR SURVIVAL, WRONGFUL DEATH - ASBESTOS; DEMAND FOR JURY TRIAL

1       dust, in view of the extraordinary legal situation, such that J-M did not

2       warn its workers, including plaintiff;

3       (b)    Deleting the findings of its own draft report that the allowable limits for

4       asbestos dust should be less than those for silica dust, and promoting a

5       false and unsafe TLV which specified maximum levels of silica dust, and

6       promoting a false and unsafe TLV which specified maximum levels of

7       dust for workers, including plaintiff, which MET LIFE knew was wrong

8       through its own studies;

9       (c)    Advising J-M to keep certain workers continuing to work at dusty areas in

10       the plant even after J-M was aware that their lungs showed asbestos-

11       induced changes, lest other workers including plaintiff be alerted to the

12       dangers of working in the dust.

13    WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE

14 ENTITIES, and each of them, as hereinafter set forth.

15                  SIXTH CAUSE OF ACTION
                        (Concert of Action)

17    AS AND FOR A FURTHER, SIXTH, SEPARATE AND DISTINCT CAUSE OF

18 ACTION FOR CONCERT OF ACTION IN THE COMMISSION, ENCOURAGEMENT, AND

19 ASSISTANCE OF BREACH OF DUTY TO WARN, PLAINTIFF COMPLAINS OF

20 DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, THEIR ALTERNATE

21 ENTITIES, AND EACH OF THEM (hereinafter CONCERT OF ACTION DEFENDANTS),

22 AND ALLEGES AS FOLLOWS:

23    67.    Plaintiff incorporates herein by reference, as though fully set forth hereat each and

24 every allegation of the First, Second and Fifth Causes of Action. (As used throughout this cause

25 of action, "plaintiff" refers to all named plaintiffs and/or all named decedents from whom the

26 named plaintiffs' injuries may derive.)

27    68.    The concerted action (hereinafter referred to as "concerted action" or

28 "conspiracy") engaged in by the above-named CONCERT OF ACTION DEFENDANTS was

1  facilitated through trade and other organizations including the Friction Materials Standards
2  Institute (FMSI), which was a successor to similar trade organizations known as the Brake Lining
3  Manufacturers' Association, and the Clutch Facing and Brake Lining Standards Institute.
4  CONCERT OF ACTION DEFENDANTS were, during the times relevant to this cause of action,
5  members of FMSI.

6      69.     The Friction Materials Standards Institute was originally incorporated under the
7  name of Clutch Facing and Brake Lining Standards Institute in 1948 as a membership
8  corporation. It included among its avowed purposes: the maintenance and raising of standards of
9  all products manufactured by its members; the collection, assembly and dissemination to
10 members of the friction materials industry scientific, engineering, technological and other
11 relevant information pertaining to the industry; and to cooperate with governmental agencies for
12 the general benefit of the public and the enhancement of the industry.

13     70.     Before 1971, CONCERT OF ACTION DEFENDANTS knew that exposure to
14 asbestos dust created grave health risks for those exposed. From 1971 forward, CONCERT OF
15 ACTION DEFENDANTS received additional information distributed through the Friction
16 Materials Standards Institute and through independent sources further confirming and elaborating
17 the serious health risks associated with exposure to airborne asbestos dust.

18     71.     CONCERT OF ACTION DEFENDANTS knew that routine practices utilized in
19 the handling and machining of their friction products during their installation and replacement
20 created significant and dangerous quantities of airborne asbestos dust that would expose workers
21 and bystanders to hazardous levels of asbestos.

22     72.     CONCERT OF ACTION DEFENDANTS knew that the magnitude of danger
23 posed by asbestos was not widely known by their consumers. CONCERT OF ACTION
24 DEFENDANTS knew that exposure to asbestos dust among their consumers could be eliminated
25 or greatly reduced by adopting different and discrete practices in the handling and machining of
26 products and by instituting specific dust control procedures in their consumers' workplaces.

27     73.     Notwithstanding their knowledge of the dangers posed by exposure to asbestos,
28 and notwithstanding their chartered ostensible purpose to cooperate with government agencies

1  for the benefit of the public, CONCERT OF ACTION DEFENDANT members of the Friction
2  Materials Standards Institute undertook concerted action to thwart, avoid, undermine, defeat,
3  compromise, evade, and otherwise dilute regulations, standards, and procedures designed to
4  reduce levels of exposure to asbestos dust and to raise awareness of the hazards of asbestos by
5  consumers and friction materials workers. Such activities include, but are not limited to the
6  following:

7         (a) CONCERT OF ACTION DEFENDANTS, at the urging and encouragement
8  of the Friction Materials Standards Institute presented to the Illinois Pollution Control Board
9  false and unsupportable opposition to a proposed prospective ban on the use of asbestos in
10  friction materials.

11         (b) CONCERT OF ACTION DEFENDANTS continuously undertook concerted
12  action to thwart, avoid, undermine, defeat, compromise, evade, and otherwise dilute OSHA
13  regulations, standards, and procedures aimed at reducing levels of ambient asbestos dust,
14  requiring the use of safety equipment and procedures, and notification of potentially exposed
15  persons of the dangers presented by asbestos dust. CONCERT OF ACTION DEFENDANTS
16  consistently misrepresented the state of science and knowledge to distort and confound public
17  understanding and appreciation of the asbestos hazard, urging a higher level of airborne asbestos,
18  less stringent requirements in the use of safety equipment and procedures, and a reduction in the
19  scope and extent of any required notification regarding the hazards posed by asbestos.

20         (c) CONCERT OF ACTION DEFENDANTS expressly undertook to adopt
21  uniform interpretations of regulations among their membership, which interpretations
22  consistently took the stance of performing at the lowest possible level which could be considered
23  compliant.

24  74.    CONCERT OF ACTION DEFENDANT members of the Friction Materials
25  Standards Institute, despite their avowed purpose to encourage and support research into
26  materials and manufacturing processes, expressly declined to pursue a proposed initiative to
27  sponsor jointly funded research into feasible alternatives to asbestos in friction products.

28  75.    Even though they knew of the substantial risks and dangers to those who would

1  use or come into contact with their asbestos-containing products, defendants took concerted
2  action by means of explicit and tacit agreements, to delay for a period of years providing
3  notification and adequate warning of these risks and dangers, and to otherwise suppress
4  information about said hazards or otherwise compromise and confound informed consumer
5  appreciation of the asbestos hazards posed by their products.

6      76.    Defendants knew that the users of their friction products would handle such
7  products or their by-products in ways that enhanced the risks of dangerous asbestos exposure.
8  Defendants failed to discharge their duty to provide timely and adequate notice of these hazards
9  or of steps that could be taken to eliminate or ameliorate the risks and dangers. Each defendant,
10 in failing to warn of these dangers, gave assistance and encouragement to every other member
11 defendant to likewise fail to warn.

12     77.    Defendants provided substantial assistance to one another in maintaining
13 ignorance among consumers as to the full nature and extent of hazards posed by asbestos, and
14 individually breached their duty to warn the consumers and users of their products.

15     78.    In addition to the above named defendants in this cause of action, the term
16 CONCERT OF ACTION DEFENDANTS as used herein includes but is not limited to:
17 DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, Anthony Lanza, M.D.,
18 Arthur Vorwald, M.D., Leroy Gardner, M.D., Johns-Manville, Raybestos-Manhattan (now
19 Raymark Industries, Inc. [Raymark]), Russell Manufacturing (whose liabilities have been
20 assigned by H.K. Porter Company), Union Asbestos and Rubber Company, Thermoid Company
21 (whose assets and liabilities have been purchased by H.K. Porter Company), Carey-Canada,
22 Quebec Asbestos Corporation, Celotex Corporation, Industrial Hygiene Foundation, Mellon
23 Institute, all members of the Asbestos Textile Institute [ATI], all members of the Friction
24 Materials Standards Institute and its predecessors, and the other entities and individuals
25 identified in this Cause of Action.

26     79.    Plaintiff is informed and believes, and thereon alleges, that at all times herein
27 mentioned, the CONCERT OF ACTION DEFENDANTS were and are corporations organized
28 and existing under and by virtue of the laws of the State of California, or the laws of some other

K:\Injured\108485\FED\Pld\cmp wd fed.wpd         20
COMPLAINT FOR SURVIVAL, WRONGFUL DEATH - ASBESTOS; DEMAND FOR JURY TRIAL

1  state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and

2  are doing business in the State of California, and that said defendants regularly conducted and/or

3  conducts business in the County of San Francisco, State of California.

4       80.    Decedent was exposed to asbestos-containing dust created by the use of the

5  asbestos products manufactured, distributed, and/or supplied by one or more of the

6  CONCERT OF ACTION DEFENDANTS named herein. The exposure to the asbestos or

7  asbestos-related products supplied by the one or more of the CONCERT OF ACTION

8  DEFENDANTS caused decedent's asbestos-related disease and injuries.

9       81.    The CONCERT OF ACTION DEFENDANTS, individually, and as agents of one

10  another and as co-conspirators, agreed and conspired among themselves, with other asbestos

11  manufacturers and distributors, and with certain individuals including, but not limited to Anthony

12  Lanza, M.D. (Lanza) and defendant METROPOLITAN LIFE INSURANCE COMPANY (MET

13  LIFE) to injure the decedent in the following fashion (the following is not an exclusive list of the

14  wrongful acts of the conspirators, but a representative list):

15      (a)    Beginning in 1929, MET LIFE entered agreements with Johns-Manville

16  and others to fund studies of the affects of asbestos exposure on Canadian asbestos miners.

17  When the data from these studies proved that Canadian asbestos miners were developing

18  asbestosis, MET LIFE, Johns-Manville, and others suppressed its publication; further, Anthony

19  Lanza, M.D. (then a MET LIFE employee) actively misrepresented the results of the Canadian

20  study for many years thereafter to meetings of health care professionals seeking information

21  regarding asbestos exposure.

22      (b)    In approximately 1934, CONCERT OF ACTION DEFENDANTS Johns-

23  Manville and MET LIFE, through their agents, Vandiver Brown and attorney J.C. Hobart, and

24  conspirator Raybestos-Manhattan (Raybestos), through its agents, Sumner Simpson and J.

25  Rohrbach, suggested to Dr. Lanza, Associate Director, MET LIFE (insurers of Johns-Manville

26  and Raybestos), that Dr. Lanza publish a study on asbestosis in which Lanza would affirmatively

27  misrepresent material facts and conclusions about asbestos exposure; including but not limited to

28  descriptions of the seriousness of the disease process of asbestosis. The misrepresentation was

1  accomplished through intentional deletion of Dr. Lanza's initial description of asbestosis as

2  "fatal" and through other selective editing that affirmatively misrepresented asbestosis as a

3  disease process less serious than it was known to be by the CONCERT OF ACTION

4  DEFENDANTS. As a result, Lanza's study was published in the medical literature containing

5  said misleading statements in 1935. The CONCERT OF ACTION DEFENDANTS were

6  motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by

7  the desire to influence proposed legislation to regulate asbestos exposure, to provide a defense in

8  lawsuits involving Johns-Manville, Raybestos, and MET LIFE, as insurer, and to promote the use

9  of their asbestos products.

10         (c)    The above-described conspiracy continued in 1936, when additional

11  CONCERT OF ACTION DEFENDANTS American Brakeblok Corporation (defendant

12  PNEUMO ABEX), defendant ASBESTOS MANUFACTURING COMPANY, defendant

13  GATKE CORPORATION, Johns-Manville, Keasbey & Mattison Company (then an alter-ego to

14  conspirator Turner & Newall, T&N), Raybestos-Manhattan (Raymark), Russell Manufacturing

15  (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber

16  Company and defendant USG, entered into an agreement with a leading medical research facility

17  named Saranac Laboratories. (The following conspirators also joined the Friction Materials

18  Standards Institute portion of the conspiracy alleged below: American Brake Block Corporation

19  (now defendant Pneumo Abex), defendant Asbestos Manufacturing Company, defendant Gatke

20  Corporation, Johns-Manville, Keasbey & Mattison Company (through Turner & Newall (T&N)

21  alter-ego Atlas Asbestos), Raybestos-Manhattan and Russell Manufacturing (whose liabilities

22  have been assumed by H.K. Porter Company).) Under the agreement, the CONCERT OF

23  ACTION DEFENDANTS acquired the power to decide what information Saranac Laboratories

24  could publish regarding asbestos disease and could also control in what form such publications

25  were to occur. Their agreement provided these CONCERT OF ACTION DEFENDANTS the

26  power and ability affirmatively to misrepresent the results of the work at Saranac, and also gave

27  these CONCERT OF ACTION DEFENDANTS power to suppress material facts included in any

28  study. On numerous occasions thereafter, the CONCERT OF ACTION DEFENDANTS

COMPLAINT FOR SURVIVAL, WRONGFUL DEATH - ASBESTOS; DEMAND FOR JURY TRIAL

1  exercised their power to prevent Saranac scientists from disclosing material scientific data,

2  resulting in numerous misstatements of fact regarding the health affects of asbestos exposure

3  being made at scientific meetings.

4          (d)     The conspiracy was furthered when on November 11, 1948, when

5  representatives of the following CONCERT OF ACTION DEFENDANTS met at Johns-

6  Manville headquarters:  Johns-Manville, American Brakeblok Division of American Brake and

7  Shoe Foundry (defendant Pneumo Abex), defendant Gatke Corporation, Garlock Sealing

8  Technologies, LLC; Keasbey & Mattison Company (then an alter-ego to conspirator Turner &

9  Newall (T&N)), Raybestos (now Raymark), Thermoid Company (whose assets and liabilities

10  were later purchased by H.K. Porter Company), Union Asbestos and Rubber Company,

11  defendant USG and MET LIFE.  Defendant U.S. Gypsum did not send a company employee to

12  the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at

13  the meeting and to take action on its behalf.

14          (e)     At the November 11, 1948 meeting, these CONCERT OF ACTION

15  DEFENDANTS, and their representatives, decided to exert their influence to materially alter and

16  misrepresent material facts about the substance of research conducted by Dr. Leroy Gardner at

17  the Saranac Laboratories beginning in 1936.  Dr. Gardner's research involved the carcinogenicity

18  of asbestos in mice and also included an evaluation of the health effects of asbestos on humans

19  with a critical review of the then-existing standards for asbestos dust exposure.

20          (f)     At this meeting, these CONCERT OF ACTION DEFENDANTS

21  intentionally and affirmatively decided that Dr. Gardner's work should be edited to delete

22  material facts about the cancer-causing propensity of asbestos, the health effects of asbestos on

23  humans and the critique of the dust standards.  The CONCERT OF ACTION DEFENDANTS

24  then published these deceptive and fraudulent statements in the medical literature as edited by

25  Dr. Arthur Vorwald, also of the Saranac Laboratories.  These CONCERT OF ACTION

26  DEFENDANTS thereby fraudulently misrepresented the risks of asbestos exposure to the public,

27  in general, and the class of persons exposed to asbestos, including the plaintiff.

28          (g)     As a direct result of influence exerted by the CONCERT OF ACTION

1  DEFENDANTS, Dr. Vorwald published Dr. Gardner's edited work in the <u>Journal of Industrial</u>

2  <u>Hygiene, AMA Archives of Industrial Hygiene and Occupational Health</u> in 1951 in a form that

3  stressed those portions of Dr. Gardner's work that the CONCERT OF ACTION DEFENDANTS

4  wished stressed, but which omitted reference to human asbestosis and cancer, thereby

5  fraudulently and affirmatively misrepresenting the extent of the risks.  The CONCERT OF

6  ACTION DEFENDANTS affirmatively and deliberately disseminated this deceptive and

7  fraudulent Vorwald publication to university libraries, government officials, agencies, and others.

8              (h)      Such actions constitute a material affirmative misrepresentation of the

9  total context of material facts involved in Dr. Gardner's work and resulted in creating an

10  appearance that inhalation of asbestos was less of health problem than Dr. Gardner's unedited

11  work indicated.

12              (i)      When Dr. Vorwald subsequently tried to publish more complete

13  information regarding Dr. Gardner's animal studies, the CONCERT OF ACTION

14  DEFENDANTS required his discharge from the Saranac Laboratories, denied him permission to

15  publish or complete Gardner's work, and actively discouraged institutions of higher learning from

16  hiring or retaining Dr. Vorwald in any capacity.

17              (j)      The following CONCERT OF ACTION DEFENDANTS were members

18  of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):  Johns-

19  Manville Corporation, Carey-Canada, individually and as successor to Quebec Asbestos

20  Corporation, the Celotex Corporation, successor to Quebec Asbestos Corporation, National

21  Gypsum Company (now known as defendant Asbestos Claims Management Corporation), and

22  Turner & Newall (T&N), individually and successor to defendant Bell Asbestos Mines Ltd.

23  These conspirators, members of Q.A.M.A., participated in the above-described misrepresentation

24  of the work of Dr. Leroy Gardner published by Dr. Arthur Vorwald in the <u>AMA Archives of</u>

25  <u>Industrial Health</u> in 1951.  Evidence of the Q.A.M.A.'s involvement in this misrepresentation

26  arises from co-conspirator Johns-Manville's membership of the Q.A.M.A., as well as

27  correspondence from co-conspirators dated 1/29/47, 11/26/47, 3/6/48, 10/15/48, 3/8/49, and

28  9/6/50, all indicating close monitoring of the editing process of Q.A.M.A.'s representative, Ivan

1 Sabourin, acting on behalf of all Q.A.M.A. members.

2         (k)    As a furtherance of the conspiracy commenced in 1929, CONCERT OF
3 ACTION DEFENDANTS who were members of the Q.A.M.A. as described above, began on or
4 about 1950 to formulate a plan to influence public opinion about the relationship between
5 asbestos and cancer by influencing the medical literature on this subject and then touting and
6 disseminating this literature to the public and to organizations and legislative bodies responsible
7 for regulatory control of asbestos with the specific intent of misrepresenting the existing
8 scientific information and suppressing contrary scientific data in their possession and control.

9         (l)    This plan of misrepresentation and influence over the medical literature
10 began on or about 1950 when the aforementioned Q.A.M.A. members selected Saranac
11 Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary
12 report authored by Dr. Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship
13 might exist in experimental animals, these Q.A.M.A. members refused to further fund the study,
14 terminated the study, and prevented any public discussion of dissemination of the results.

15         (m)    As a result of the termination of Q.A.M.A./Saranac study, the CONCERT
16 OF ACTION DEFENDANTS fraudulently withheld information from the public and
17 affirmatively misrepresented to the public and responsible legislative and regulatory bodies that
18 asbestos did not cause cancer, including affirmative misrepresentations by CONCERT OF
19 ACTION DEFENDANTS and CONCERT OF ACTION DEFENDANTS' agents K.W. Smith,
20 M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., Anthony Lanza, M.D., Vandiver Brown, and Ivan
21 Sabourin, said misrepresentations being directed to <u>inter alia</u>, U.S. Government officials,
22 Canadian government officials, U.S. National Cancer Institute, medical organizations, health
23 professionals, and the general public, including decedent.

24         (n)    Subsequently, the Q.A.M.A. CONCERT OF ACTION DEFENDANTS
25 contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the
26 relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and
27 Truan (Braun and Truan) reported to the Q.A.M.A. that asbestosis did increase a worker's risk of
28 incurring lung cancer.

1           (o)     The Q.A.M.A. CONCERT OF ACTION DEFENDANTS as a furtherance

2 of the conspiracy commenced in 1929, thereafter caused, in 1958, a publication of the work by

3 Braun and Truan in which the findings regarding increased incidence of cancer in persons with

4 asbestosis was edited out (stricken) by agents of the Q.A.M.A. The published version of

5 Braun/Truan study contained a conclusion that asbestos exposure, alone, did not increase the

6 incidence of lung cancer, a conclusion known by the conspirators to be false.

7           (p)     By falsifying and causing publication of studies concluding that asbestos

8 exposure did not cause lung cancer and simultaneously omitting documented findings that

9 asbestosis did increase the risk of lung cancer, the CONCERT OF ACTION DEFENDANTS

10 affirmatively misrepresented to the public and concealed from the public the extent of risks

11 associated with inhalation of asbestos fibers.

12           (q)     In furtherance of the ongoing 1929 conspiracy, in approximately 1958,

13 these Q.A.M.A. CONCERT OF ACTION DEFENDANTS publicized the fraudulently edited

14 works of Drs. Braun and Truan at a symposium in an effort to misrepresent fraudulently to the

15 public and persons exposed to asbestos that the inhalation of asbestos dust would not cause

16 cancer.

17           (r)     The fraudulent misrepresentations beginning in 1929 as elaborated above

18 and continuing with the publication of the 1958 Braun/Truan study influenced the standards set

19 for asbestos exposure. The developers of such standards failed to lower the maximum exposure

20 limits because a cancer risk, associated with asbestos inhalation, but had not been proven.

21           (s)     In furtherance of the 1929 conspiracy, in 1967, Q.A.M.A. CONCERT OF

22 ACTION DEFENDANTS decided, at their trade association meeting, that they would

23 intentionally mislead consumers about the extent of risks involved in inhalation of asbestos

24 products.

25           (t)     In furtherance of the 1929 conspiracy, in 1952, a Symposium regarding the

26 health effects of asbestos was held at the Saranac Laboratories. The following CONCERT OF

27 ACTION DEFENDANTS were in attendance: MET LIFE, Lanza, Johns-Manville, Turner &

28 Newall (T&N), Raybestos-Manhattan (now Raymark), and Q.A.M.A. members by way of their

1  agents, Cartier, Sabourin and LaChance.

2          (u)    At the 1952 Saranac meeting, the occurrence of lung cancer and asbestosis
3  in product users was discussed and the carcinogenic properties of all fiber types of asbestos was
4  also discussed. In an affirmative attempt to mislead the public about the extent of health risks
5  associated with asbestos, and in an effort fraudulently to conceal those risks from the pubic, these
6  CONCERT OF ACTION DEFENDANTS conspired to prevent publication of the record of this
7  1952 Saranac Symposium and it was not published. In addition, the CONCERT OF ACTION
8  DEFENDANTS induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal
9  studies showing excess cancers in animals which thereby fraudulently misrepresented existing
10  secret data which could not be publicized owing to the secrecy provisions contained in the 1936
11  Saranac agreement heretofore described.

12          (v)    The following CONCERT OF ACTION DEFENDANTS were members
13  of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos (now
14  Raymark), Johns-Manville, H.K. Porter, Gatke Corporation; Garlock Sealing Technologies,
15  LLC; Keasbey & Mattison, individually and through its alter-ego Turner & Newall (T&N) and
16  National Gypsum (defendant Asbestos Claims Management Corporation), Uniroyal, Inc.,
17  individually and through its alter-egos, CDU Holding Company, Uniroyal Holding Company and
18  Uniroyal Goodrich Tire Company.

19          (w)    In furtherance of the forgoing conspiracy, in 1947, these CONCERT OF
20  ACTION DEFENDANTS, members of the ATI, received a report from industrial hygienist
21  W.C.L. Hemeon (Hemeon) regarding asbestos, which suggested re-evaluation of the then-
22  existing maximum exposure limits for asbestos exposure. These CONCERT OF ACTION
23  DEFENDANTS caused the Hemeon report not to be published and thereby fraudulently
24  concealed material facts about asbestos exposure from the public and affirmatively
25  misrepresented to the public and class of persons exposed to asbestos that the then existing
26  maximum exposure limit for asbestos was acceptable. Thereafter, these CONCERT OF
27  ACTION DEFENDANTS withheld additional material information on the dust standards from
28  The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further

1  influencing evaluations of their Threshold Limit Values for asbestos exposure.

2              (x)  In furtherance of the forgoing conspiracy, in 1953, CONCERT OF

3  ACTION DEFENDANT National Gypsum (Asbestos Claims Management Corporation),

4  through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene

5  regarding health hazards of asbestos spray products, refused to mail a proposed response to that

6  division indicating that respirators should be worn by applicators of the products.  National

7  Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos

8  spray products to wear respirators and fraudulently concealed from such applicators the need for

9  respirators and thereby misrepresented the risks associated with asbestos exposure.

10              (y)  In furtherance of the forgoing conspiracy, in 1955, CONCERT OF

11  ACTION DEFENDANT Johns-Manville, through its agent Dr. Kenneth Smith, caused to be

12  published in the <u>AMA Archives of Industrial Health</u>, an article entitled "Pulmonary Disability in

13  Asbestos Workers."  This published study materially altered the results of an earlier study in

14  1949 concerning the same set of workers.  This alteration of Dr. Smith's study constituted a

15  fraudulent and material misrepresentation about the extent of the risk associated with asbestos

16  inhalation.

17              (z)  In furtherance of the forgoing conspiracy, in 1955, the National Cancer

18  Institute held a meeting at which CONCERT OF ACTION DEFENDANT Johns-Manville,

19  individually and as an agent for other co-conspirators and Dr. Vorwald, as agent of CONCERT

20  OF ACTION DEFENDANTS, affirmatively misrepresented that there was no existing animal

21  studies concerning the relationship between asbestos exposure and cancer, when, in fact, the

22  CONCERT OF ACTION DEFENDANTS were in secret possession of several suppressed

23  studies, which demonstrated that positive evidence did exist.

24             (aa)  In furtherance of the forgoing conspiracy, in 1957, these CONCERT OF

25  ACTION DEFENDANTS and members of the ATI, jointly rejected a proposed research study on

26  cancer and asbestos and this resulted in fraudulently concealing from the public material facts

27  regarding asbestos exposure, and also constituted an affirmative misrepresentation of the then-

28  existing knowledge about asbestos exposure and lung cancer.

(bb)    In furtherance of the forgoing conspiracy, in 1964, CONCERT OF ACTION DEFENDANTS who were members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently published by Dr. Irving J. Selikoff of the Mount Sinai Research Center.  Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

(cc)    CONCERT OF ACTION DEFENDANT Mellon Institute and CONCERT OF ACTION DEFENDANT Industrial Hygiene Foundation (IHF) were institutes whose functions included involvement in research regarding the health effects of inhaling asbestos dust.

(dd)    Beginning in the early 1940's, the IHF was involved in a study by Hemeon entitled Report of Preliminary Dust Investigation for Asbestos Textile Institute, June 1947.  This study was done in connection with members of the Asbestos Textile Institute (ATI).  This study found that workers exposed to less than the recommended maximum exposure level for asbestos were nonetheless developing disease.  As a part of the conspiracy, the IHF never published this study.

(ee)    Beginning in the mid 1950's, the IHF and the Mellon Institute were involved in the publication of works by Braun and Truan entitled An Epidemiological Study of Lung Cancer in Asbestos Miners.  In its original, unedited form in September, 1957, this study had concluded that workers with asbestosis had an increased incidence of lung cancer and that the Canadian government had been under-reporting cases of asbestosis.  The final, published version of this study in June 1958, deleted the conclusion that workers with asbestosis suffered an increased incidence of lung cancer and that the Canadian government had been under-reporting asbestosis cases.  The IHF and the Mellon Institute conspired with the members of the Quebec Asbestos Mining Association (Q.A.M.A.) and their legal counsel, Ivan Sabourin, and other CONCERT OF ACTION DEFENDANTS to delete the above-describe information regarding asbestos and cancer.

(ff)    The above-described actions of the IHF and the Mellon Institute constituted intentional deception and fraud in actively misleading the public about the extent of

1  the hazards connected with breathing asbestos dust.

2          (gg)     The above-described conspiratorial and fraudulent actions of the IHF and

3  the Mellon Institute substantially contributed to retarding the development of knowledge

4  about the hazards of asbestos and thereby substantially contributed to injuries suffered by the

5  decedent.

6          (hh)     All CONCERT OF ACTION DEFENDANTS identified above, approved,

7  ratified, and furthered the previous conspiratorial acts of CONCERT OF ACTION

8  DEFENDANTS Johns-Manville, Raybestos (now Raymark), Lanza, and MET LIFE, and all the

9  alleged co-conspirators during the date and circumstances set forth above, acted as agents, and

10  co-conspirators for the other CONCERT OF ACTION DEFENDANTS.

11          (ii)     As evidence of Raymark's fraud, concealment, suppression, and

12  conspiratorial misconduct and of the referenced CONCERT OF ACTION DEFENDANTS, and

13  each of them, as herein set forth, Raymark's President and/or other senior executives

14  corresponded with other senior executives of Raymark's co-conspirators, which series of

15  correspondence and related documents and papers are commonly referenced as "The Sumner

16  Simpson Papers."

17          (jj)     Further as evidence of the fraud, concealment, suppression, and

18  conspiratorial misconduct of the members of the Asbestos Textile Institute as herein set forth, the

19  ATI and the Industrial Hygiene Foundation kept minutes of their regular meetings, discussions,

20  resolutions, and related actions, recorded in "The ATI Minutes."

21          (kk)     MET LIFE was an active participant in the foregoing conspiracy and

22  benefitted thereby. MET LIFE benefitted from its involvement, because of the following non-

23  exclusive list:

24          (1)     by providing workers' compensation insurance to the CONCERT OF

25                    ACTION DEFENDANTS;

26          (2)     by providing life insurance for employees of the CONCERT OF ACTION

27                    DEFENDANTS;

28          (3)     by providing health insurance or health care for the employees of the

1   CONCERT OF ACTION DEFENDANTS;

2     (4) by providing health information and resources;

3     (5) by purchasing substantial stock in asbestos-related companies, including

4        stock of CONCERT OF ACTION DEFENDANTS; and

5     (6) by developing information by which asbestos-related claims for

6        compensation could be defeated.

7     82. The foregoing conspiracy was furthered through the formation of the Friction

8   Materials Standards Institute [FMSI] and its predecessors, the Brake Lining Manufacturers'

9   Association, and the Clutch Facing and Brake Lining Standards Institute. The members thereof

10  joined with, ratified, and furthered the conspiratorial actions of the above-identified conspirators.

11    (1) The Friction Materials Standards Institute, and its predecessors, the Brake

12  Lining Manufacturers' Association, the Clutch Facing & Brake Linings Standards Institute, were

13  formed to be the ears and mouthpiece of the friction materials industry. The initial members of

14  the Friction Materials Standards Institute between 1950 and 1953 included CONCERT OF

15  ACTION DEFENDANTS Asbestos Manufacturing Company, T&N, PLC. (through its alter-ego

16  Atlas Asbestos Company), Brassbestos Brake Lining Company, Fibre & Metal Products

17  Company, Gatke Corporation, Maremont (through its predecessor-in-interest Grizzly

18  Manufacturing), H. Krasne Manufacturing Company, Lasco Brake Products, HONEYWELL,

19  INC. (successor-in-interest to ALLIEDSIGNAL INC. -- then known as Bendix Aviation

20  Corporation), L. J. Miley Company, Raymark (then known as Raybestos-Manhattan), Riteset

21  Manufacturing Company, Rossendale-Ruboil Company, Russell Manufacturing Company,

22  Scandura (then known as Scandinavian Belting Company), Southern Friction Materials

23  Company, U.S. Spring & Bumper Company, Pneumo Abex (Through its Predecessor-in-interest,

24  S.K. Wellman Company) and Lear-Siegler, Inc. (now Lear-Siegler Diversified Holdings Corp.)

25  And Bridgestone/Firestone, Inc. (through their predecessor-in-interest World Bestos

26  Corporation). By 1973, the following joined the Friction Materials Standards Institute:

27  CONCERT OF ACTION DEFENDANTS Auto Friction Corporation, Auto Specialties

28  Manufacturing Company, Chrysler Corporation, Emsco Asbestos Company, Forcee

1  Manufacturing Corporation, General Motors Corporation, H.K. Porter Company (through its

2  Thermoid division), Johns-Manville Corporation, Lear-Siegler, Inc. (now Lear-Siegler

3  Diversified Holdings Corp.) (Through its Predecessor-in-interest Royal Industries), Molded

4  Industrial Friction Corporation, Morton-Thiokol (Through its Predecessor-in-interest Thiokol

5  Chemical Corporation), National Transport Supply Inc., Parker-Hannifin Corporation (through

6  its predecessor-in-interest Pick Manufacturing Company), Pneumo Abex's American Brakeblok

7  division, Silver Line Products Inc., Standco Inc., Universal Friction Materials Company, and

8  Wheeling Brake Block Manufacturing Company.  On information and belief, plaintiff alleges

9  that the following manufacturers and/or distributors of asbestos-containing automotive friction

10 products joined with, ratified, and furthered the conspiratorial actions of the above-identified

11 conspirators, including the conspirators who were members of the FMSI and its predecessors:

12 CONCERT OF ACTION DEFENDANTS, The Budd Company, Dana Corporation, Ford Motor

13 Company, General Motors Corporation, Lear-Siegler, Inc. (now Lear-Siegler Diversified

14 Holdings Corp.), Morton-Thiokol (now Morton International, Inc. ), Standard Motor Products,

15 Inc. (EIS Brand Brakes); and Borg-Warner.

16            (2)     Even though they disseminated materials and information to the contrary,

17 The Friction Materials Standards Institute conspirators knew, and suppressed, that:

18                             (i)     OSHA regulations, even if enforced and complied with, would not

19 prevent asbestos disease in workers exposed to their products;

20                             (ii)    chrysotile asbestos caused mesothelioma and other incurable

21 disease;

22                             (iii)   brake workers suffered "considerable exposures" to respirable

23 asbestos fibers during the intended use, installation, and expected

24 replacement of friction materials;

25                             (iv)   there was no "safe" level of occupational exposure to respirable

26 asbestos; and

27                             (v)    there was a substantial risk and danger suffered by bystanders and

28 family members of brake mechanics, because of the release of respirable

1                       asbestos in the use of friction materials, as herein described.

2           (3)     Even though they knew of the substantial risks and dangers to those who

3 would use or come into contact with their asbestos-containing products, CONCERT OF

4 ACTION DEFENDANTS took concerted action by means of explicit and tacit agreements, to

5 delay for a period of years providing notification and adequate warning of the risks and dangers.

6 CONCERT OF ACTION DEFENDANTS knew that the users of their products would handle

7 such products or their by-products in ways that enhanced the risks of dangerous asbestos

8 exposure, but they conspired to give each other assistance and encouragement in failing to

9 provide timely and adequate notices of the hazards or of steps that would be taken to eliminate or

10 ameliorate the risks and dangers.

11        83.     The acts and omissions of the CONCERT OF ACTION DEFENDANTS, as

12 described above, and each of them, constitute fraudulent concealment and/or fraudulent

13 misrepresentation, which caused injury to the decedent, including, but not limited to, the

14 following manner:

15           (a)     The material published or caused to be published by the CONCERT OF

16 ACTION DEFENDANTS was false and incomplete in that the CONCERT OF ACTION

17 DEFENDANTS, knowingly and deliberately deleted references to the known health hazards of

18 asbestos and asbestos-related products.

19           (b)     The CONCERT OF ACTION DEFENDANTS, with intent to defraud,

20 individually, as members of a conspiracy, and as agents of other CONCERT OF ACTION

21 DEFENDANTS, intended that the publication of false and misleading reports to the general

22 public and individuals therein, and/or the intentional suppression and nondisclosure of

23 documented reports of health hazards of asbestos:

24                   (1)     maintain a favorable atmosphere for the continued sale and

25                       distribution of asbestos and asbestos-related products;

26                   (2)     assist in the continued pecuniary gain of CONCERT OF ACTION

27                       DEFENDANTS, through the sale of their products;

28                   (3)     influence in the CONCERT OF ACTION DEFENDANTS' favor

1    proposed legislation to regulate asbestos exposure and;

2        (4)    provide a defense in law suits brought for injury resulting from

3    asbestos disease.

4        (c)    The CONCERT OF ACTION DEFENDANTS, individually, as members

5    of a conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, had a duty to

6    disclose information regarding the health hazards of asbestos within their knowledge and/or

7    control. The CONCERT OF ACTION DEFENDANTS, knowingly, and intentionally breached

8    this duty through their fraudulent concealment as described herein.

9        (d)    Decedent and others reasonably relied, both directly and indirectly, upon

10   the published medical and scientific data documenting the purported safety of asbestos and

11   asbestos-related products, and in the absence of published medical and scientific reports of the

12   hazards of asbestos continued exposure to asbestos. Decedent believed asbestos to be safe and

13   was unaware of the hazards due to conspiratorial and fraudulent conduct. Decedent was not

14   warned of the hazards of asbestos dust as a direct result of the above-described conspiracy and

15   fraudulent concealment. If decedent had known of the health hazards of asbestos, of which

16   decedent was unaware as a direct result of the conspirator's fraudulent concealment, decedent

17   would have acted differently regarding decedent's exposure to asbestos and asbestos-related

18   products.

19       (e)    CONCERT OF ACTION DEFENDANTS, individually, as members of a

20   conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, intended that

21   plaintiff rely on the deceptive and fraudulent reports that the conspiracy caused to be published

22   throughout the United States regarding the safety of asbestos and asbestos-related products and to

23   rely on the absence of published medical and scientific data (because of the CONCERT OF

24   ACTION DEFENDANTS's suppression) regarding the hazards of asbestos and asbestos-related

25   products and thereby caused plaintiff and others to continue their exposure to asbestos products.

26       (f)    CONCERT OF ACTION DEFENDANTS, individually, as members of a

27   conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS were and are in a

28   position of superior knowledge regarding the health hazards of asbestos and therefore the

1  decedent reasonably relied, both directly and indirectly, on the published reports commissioned

2  by the CONCERT OF ACTION DEFENDANTS, regarding the health hazards of asbestos and

3  the absence of published information (because of the suppression by the CONCERT OF

4  ACTION DEFENDANTS) regarding the hazards of asbestos and asbestos-related products.

5           (g)    As a direct result of the continuing and on-going conduct of the

6  CONCERT OF ACTION DEFENDANTS, as alleged herein, the decedent contracted asbestos-

7  related disease and suffered injuries and incurred damages, which are described in greater detail

8  in the forgoing Paragraphs.

9      84.    MET LIFE acted in concert with the foregoing described parties (the CONCERT

10  OF ACTION DEFENDANTS) and pursuant to a common design, as previously described, to

11  cause injury to decedent.

12      85.    MET LIFE knew that the conduct of Johns-Manville, Raybestos (now Raymark),

13  defendant USG, American Brakeblok Corporation (now defendant PNEUMO ABEX), Keasbey-

14  Mattison Company (now T&N), and the other CONCERT OF ACTION DEFENDANTS was

15  coercive, fraudulent, and deceitful towards others (including decedent) and that CONCERT OF

16  ACTION DEFENDANTS' conduct was a breach of duties owed to decedent; and MET LIFE

17  gave substantial assistance and encouragement to Johns-Manville and the other CONCERT OF

18  ACTION DEFENDANTS in breaching their duties to decedent and others.

19      86.    MET LIFE provided substantial assistance to the foregoing CONCERT OF

20  ACTION DEFENDANTS in accomplishing their tortious result and their breach of duties to

21  plaintiff.

22      87.    Decedent was insured, directly or indirectly, by MET LIFE and as such was owed

23  a fiduciary duty by MET LIFE which duty was breached by its foregoing conduct and conspiracy

24  which thereby caused plaintiff's asbestos-related injuries.

25      88.    The CONCERT OF ACTION DEFENDANTS made representations to decedent

26  and others concerning asbestos-containing products including but not limited to:

27           (a)    the statements set forth and summarized in the foregoing paragraphs

28           (b)    that asbestos in commercially used insulation products was not hazardous

1 (this statement was known to be false by the CONCERT OF ACTION DEFENDANTS)

2            (c)     the amount of asbestos in the air necessary to cause disease was five

3 million particles per cubic foot (this statement was known to be false by the CONCERT OF

4 ACTION DEFENDANTS)

5            (d)     that asbestos does not cause cancer (this statement was known to be false

6 by the CONCERT OF ACTION DEFENDANTS);

7            (e)     in addition, the CONCERT OF ACTION DEFENDANTS actively and

8 fraudulently concealed facts from the plaintiff and others including, but not limited to:

9                 (1)     that asbestos-related disease can be a fatal disease,

10                 (2)     that asbestos causes various forms of lung cancer,

11                 (3)     that individuals should protect themselves from breathing asbestos

12                       dust,

13                 (4)     the extent of asbestos disease in exposed populations,

14                 (5)     information regarding the levels of airborne asbestos that can cause

15                       disease,

16                 (6)     their experience with workers' compensation claims related to

17                       asbestos exposure,

18                 (7)     the statements set forth in foregoing paragraphs.

19      89.     Further, the CONCERT OF ACTION DEFENDANTS knew that their foregoing

20 statements were false and that, by their acts, they were actively and fraudulently concealing

21 adverse information regarding the health affects of asbestos including the facts set forth above;

22 the CONCERT OF ACTION DEFENDANTS made the false statements and concealed the

23 information with the intent to deceive; decedent and others relied both directly and indirectly on

24 the foregoing false statements and their lack of knowledge resulting from their fraudulent

25 concealment, resulting in and causing asbestos-related injuries and damages as more fully set

26 forth herein.

27      90.     The asbestos-containing products that CONCERT OF ACTION DEFENDANTS

28 manufactured, marketed, distributed, sold, and otherwise supplied were defective; decedent was

1  exposed to asbestos from the CONCERT OF ACTION DEFENDANTS' products, which caused
2  his asbestos-related injuries as more fully set forth in the foregoing paragraphs.

3      91.    Additionally and alternatively, as a direct result of MET LIFE's actions and
4  omissions, decedent was caused to remain ignorant of all the dangers of asbestos resulting in
5  plaintiff, his agents, employers, and the general public to be aware of the true and full dangers of
6  asbestos, deprive decedent of the opportunity to decide for himself whether he wanted to take the
7  risk of being exposed to asbestos, denied decedent the opportunity to take precautions against the
8  dangers of asbestos and caused decedent's damages herein.

9      WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE
10  ENTITIES, and each of them, as hereinafter set forth.

11              SEVENTH CAUSE OF ACTION
                (Fraud and Deceit/Concealment)
12

13      AS AND FOR A FURTHER, SEVENTH, SEPARATE AND DISTINCT CAUSE OF
14  ACTION FOR FRAUD AND DECEIT/CONCEALMENT, PLAINTIFF COMPLAINS OF
15  DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, THEIR ALTERNATE
16  ENTITIES, AND EACH OF THEM (hereinafter FRAUD DEFENDANTS), AND ALLEGES
17  AS FOLLOWS:

18      92.    Plaintiff incorporates herein by reference, as though fully set forth hereat, each
19  and every allegation of the First, Second, Fifth and Sixth Causes of Action as though fully set
20  forth herein. (As used throughout this cause of action, "plaintiff" refers to all named plaintiffs
21  and/or all named decedents from whom the named plaintiffs' injuries may derive.)

22      93.    The term FRAUD DEFENDANTS as used herein includes but is not limited to:
23  METROPOLITAN LIFE INSURANCE COMPANY, Anthony Lanza, M.D., Johns-Manville,
24  Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), United States Gypsum
25  Company [USG]), American Brakeblok Corporation (now Pneumo Abex Corporation [Pneumo
26  Abex]), Keasbey-Mattison Company (now T&N, Ltd. [T&N]), all members of the Asbestos
27  Textile Institute [ATI], American Conference of Industrial Hygienists, Inc., and the other entities
28  and individuals identified in this Cause of Action.

1    94.    Plaintiff is informed and believes, and thereon alleges, that at all times herein

2    mentioned, the FRAUD DEFENDANTS were and are corporations organized and existing under

3    and by virtue of the laws of the State of California, or the laws of some other state or foreign

4    jurisdiction, and that defendants were and are authorized to do and/or were and are doing

5    business in the State of California, and that said defendants regularly conducted and/or conducts

6    business in the County of San Francisco, State of California.

7    95.    FRAUD DEFENDANT American Conference of Governmental Industrial

8    Hygienists, Inc. (ACGIH) sets guidelines for occupational health called Threshold Limit Values

9    (TLVs). These guidelines are relied on by OSHA (the Occupational Safety and Health

10   Administration) in the United States and similar agencies around the world. Criticisms of the

11   guide-line setting process have pointed to problems with data collection, inadequate research,

12   overwhelming dependence on data supplied by financially interested corporations, and slow

13   response to advances in medical information. In carrying out the aforesaid acts, the ACGIH was

14   negligent in their failure to analyze or critically evaluate previously published literature, or

15   review and incorporate current literature, failure to adequately assess the financially motivated

16   scientific data provided by asbestos corporations, their insurers, and medical consultants, and

17   their limited review process, including but not limited to the following representative list:

18   (a) The NATIONAL CONFERENCE OF GOVERNMENT INDUSTRIAL

19   HYGIENISTS (NCGIH) was formed in 1938. In 1942, the NCGIH began to develop a list of

20   proposed Maximum Permissible Concentrations (MPC) or Maximum Allowable Atmospheric

21   Concentrations, for various hazardous atmospheric substances, including asbestos. In the

22   minutes of the Fifth Annual Meeting in 1942, the MPC Subcommittee internally noted that the

23   MPC's were "not to be construed as recommended safe concentrations." In 1946, the NCGIH

24   was renamed the American Conference of Governmental Industrial Hygienists, Inc. (ACGIH),

25   and despite the internally acknowledged inadequacy of the asbestos MPC or the lack of any

26   research by the ACGIH, they adopted, circulated, represented, and otherwise promulgated a 5

27   million particles per cubic foot (mppcf) asbestos guideline based on a faulty study performed by

28   Dr. W.C. Dreessen in 1938 at a textile plant in North Carolina.

1    (b) In 1947, the ACGIH vaguely defined the MPC as "that amount of gas, vapor,
2 fume, or dust which can be tolerated by man with no bodily discomfort nor impairment of bodily
3 function, either immediate or after years of exposure." In 1948, they changed the name of the
4 guideline from MPC to Threshold Limit Values (TLV), but still failed to adequately define the
5 guideline or verify its propriety or scientific justification. In 1953, they issued a new conflicted
6 definition, describing the guideline as both an "average" and a "maximum." Despite their failure
7 to conduct any new evaluations or research, in 1961, the ACGIH propounded a new definition of
8 the TLV as a "time-weighted average concentration." While arbitrarily adopting and changing
9 the definition of the TLV, the ACGIH never performed any studies to test the scientific validity
10 of the 5 mppcf TLV guideline.

11    (c) In 1968, the ACGIH reviewed the 5 mppcf guideline, and replaced it with a 2
12 mppcf guideline. However, the ACGIH negligently published the new guideline as 12 mppcf,
13 never intending said numeric figure to be the actual recommended guideline. Despite internally
14 acknowledging the error in their annual meetings, the ACGIH did not correct it until 1971.

15    (d) Despite decades of scientific studies linking asbestos to cancer, the ACGIH
16 ignored the carcinogenic dangers of asbestos until 1974.

17  96.  Decedent was exposed to asbestos-containing dust created by the use of the
18 asbestos products manufactured, distributed and/or supplied by one or more of the
19 FRAUD DEFENDANTS. The exposure to the asbestos or asbestos-related products supplied by
20 the FRAUD DEFENDANTS caused decedent's asbestos-related disease and injuries.

21  97.  Plaintiff incorporates herein by reference, as though fully set forth hereat at, each
22 and every paragraph of the Sixth Cause of Action, which describes the allegations against, and
23 actions of the CONSPIRACY DEFENDANTS.

24  98.  Further, the FRAUD DEFENDANTS knew that their foregoing statements were
25 false and that by their acts they were actively and fraudulently concealing adverse information
26 regarding the health affects of asbestos including the facts set forth above; the FRAUD
27 DEFENDANTS made the false statements and concealed the information with the intent to
28 deceive; decedent and others relied both directly and indirectly on the foregoing false statements

K:\Injured\108485\FED\Pld\cmp wd fed.wpd          39

1  and their lack of knowledge resulting from their fraudulent concealment, resulting in and causing
2  asbestos-related injuries and damages as more fully set forth herein.

3      99.     The asbestos-containing products that FRAUD DEFENDANTS manufactured,
4  marketed, distributed, sold, and otherwise supplied were defective; decedent was exposed to
5  asbestos from the FRAUD DEFENDANTS' products which caused his asbestos-related injuries
6  as more fully set forth in the foregoing paragraphs.

7      100.    Additionally and alternatively, as a direct result of FRAUD DEFENDANT MET
8  LIFE's actions and omissions, decedent was caused to remain ignorant of all the dangers of
9  asbestos resulting in decedent, his agents, employers, and the general public to be aware of the
10 true and full dangers of asbestos, deprive decedent of the opportunity to decide for himself
11 whether he wanted to take the risk of being exposed to asbestos, denied decedent the opportunity
12 to take precautions against the dangers of asbestos and caused decedent's damages herein.

13     WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE
14 ENTITIES, and each of them, as hereinafter set forth.

15                          EIGHTH CAUSE OF ACTION
                   (Fraud and Deceit/Intentional Misrepresentation)
16

17     AS AND FOR A FURTHER, EIGHTH, SEPARATE AND DISTINCT CAUSE OF
18 ACTION FOR FRAUD AND DECEIT/INTENTIONAL MISREPRESENTATION, PLAINTIFF
19 COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, THEIR
20 ALTERNATE ENTITIES AND EACH OF THEM (hereinafter INTENTIONAL
21 MISREPRESENTATION DEFENDANTS), AND ALLEGES AS FOLLOWS:

22     101.    Plaintiff incorporates herein by reference, as though fully set forth hereat, each
23 and every allegation of the First and Second Causes of Action, and each and every paragraph of
24 the Fifth, Sixth and Seventh Causes of Action that describes the allegations against, and actions
25 of the CONSPIRACY DEFENDANT MET LIFE as though fully set forth herein. (As used
26 throughout this cause of action, "plaintiff" refers to all named plaintiffs and/or all named
27 decedents from whom the named plaintiffs' injuries may derive.)

28     102.    Plaintiff is informed and believes, and thereon alleges, that at all times herein

1  mentioned, the INTENTIONAL MISREPRESENTATION DEFENDANTS were and are corpor-
2  ations organized and existing under and by virtue of the laws of the State of California, or the
3  laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do
4  and/or were and are doing business in the State of California, and that said defendants regularly
5  conducted and/or conducts business in the County of San Francisco, State of California.

6      103.    Plaintiff incorporates herein by reference, as though fully set forth hereat, each
7  and every paragraph of the Sixth Cause of Action that describes the allegations against, and
8  actions of the CONSPIRACY DEFENDANT MET LIFE.

9      104.    Further, the INTENTIONAL MISREPRESENTATION DEFENDANTS knew
10  that their foregoing statements were false and that by their acts they were actively and
11  fraudulently concealing adverse information regarding the health affects of asbestos including the
12  facts set forth above; the INTENTIONAL MISREPRESENTATION DEFENDANTS made the
13  false statements and misrepresented the information with the intent to deceive; decedent and
14  others relied both directly and indirectly on the foregoing false statements and their lack of
15  knowledge resulting from their intentional misrepresentation, resulting in and causing asbestos-
16  related injuries and damages as more fully set forth herein.

17      105.    The asbestos-containing products that INTENTIONAL MISREPRESENTATION
18  DEFENDANTS manufactured, marketed, distributed, sold, and otherwise supplied were
19  defective; decedent was exposed to asbestos from the INTENTIONAL MISREPRESENTATION
20  DEFENDANTS' products, which caused his asbestos-related injuries as more fully set forth in
21  the foregoing paragraphs.

22      106.    Additionally and alternatively, as a direct result of INTENTIONAL
23  MISREPRESENTATION DEFENDANTS MET LIFE's actions and omissions, decedent was
24  caused to remain ignorant of all the dangers of asbestos resulting in decedent, his agents,
25  employers and the general public to be aware of the true and full dangers of asbestos, deprive
26  decedent of the opportunity to decide for himself whether he wanted to take the risk of being
27  exposed to asbestos, denied decedent the opportunity to take precautions against the dangers of
28  asbestos and caused plaintiff's damages herein.

1       WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE

2 ENTITIES, and each of them, as hereinafter set forth.

3 **IV.**

4 **DAMAGES AND PRAYER**

5       WHEREFORE, Plaintiffs pray judgment against defendants, their "alternate entities," and

6 each of them in an amount to be proved at trial in each individual case, as follows:

7       (a)    For Plaintiffs' general damages according to proof;

8       (b)    For Plaintiffs' loss of income, wages and earning potential according to proof;

9       (c)    For Plaintiffs' medical and related expenses according to proof;

10       (d)    For Plaintiffs' cost of suit herein;

11       (e)    For damages for fraud according to proof; and

12       (f)    For such other and further relief as the Court may deem just and proper, including

13 costs and prejudgment interest.

14 Dated: 5/30/14                BRAYTON❖PURCELL LLP

15

16                       By:

17                          David R. Donadio, Esq., S.B. #154436
                         Attorneys for Plaintiffs

18

19

20 JURY DEMAND

21       Plaintiffs hereby demand trial by jury of all issues of this cause.

22

23 Dated: 5/30/14                BRAYTON❖PURCELL LLP

24

25                       By:

26                          David R. Donadio, Esq., S.B. #154436
                         Attorneys for Plaintiffs

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

COMPLAINT FOR SURVIVAL, WRONGFUL DEATH - ASBESTOS; DEMAND FOR JURY TRIAL

1                                     EXHIBIT A

2  Decedent: RONNIE STANTON, Deceased.

3

4  Decedent's injuries: Decedent was diagnosed with lung cancer on or about May 2013, and with

5  asbestosis and asbestos-related pleural disease on or about August 2008.

6

7  Decedent died on June 4, 2013.

8

9  Retirement Status: Decedent retired from his last place of employment as a result of becoming

10 disabled due to an illness not related to asbestos. He has therefore suffered no disability from his

11 asbestos-related disease as "disability" is defined in California Code of Civil Procedure § 340.2.

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| US Navy | Naval Reserve Center Surface Division 9-167 Cadillac, MI | Seaman Recruit | 09/05/1961-06/10/1962 |
|  | Naval Training Center, Great Lakes, IL | Trainee | 06/10/1962-06/23/1962 |
|  | AMHERST (PCER- 853) | Boilermaker | 06/24/1962-07/07/1962 |
|  | Naval Reserve Center Surface Division 9-167 Cadillac, MI | Boilermaker | 07/09/1962-07/08/1963 |
|  | Naval Receiving Station Philadelphia, PA | Boilermaker | 07/10/1963-08/1963 |
|  | Naval Air Station Quonset Point, Davisville, RI | Boilermaker | 08/10/1963-08/15/1963 |
|  | Drydocked at: Boston Naval Shipyard, Boston, MA WASP (CV-18) | Boilermaker | 10/1963-04/1964 |
|  | Naval Training Center, Bainbridge, MD | Boilermaker | 07/21/1965-09/04/1967 |

COMPLAINT FOR SURVIVAL, WRONGFUL DEATH - ASBESTOS; DEMAND FOR JURY TRIAL

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Smeltzer Orchard Co. 6032 Joyfield Rd. Frankfort, MI | Smeltzer Orchard Co. 6032 Joyfield Rd. Frankfort, MI | Forklift Operator | 7/1962-12/1962 |
| Bethlehem Steel Corp. 101 Park Avenue New York, NY | Bethlehem Steel Shipyard Boston, MA | Insulator | 7/1965-3/1966 (6 months) |
| Lewis & Sheppard Hyster Co. Successor in Interest Watertown, MA | Lewis & Sheppard Watertown, MA | Assembler | 1/1968-3/1970 |
| Hyster-Yale Materials Handling, Inc. 650 N.E. Holladay St. #1600 Portland, OR | Hyster-Yale Materials Watertown, MA | Assembler | 4/1970-3/1971 |

NON-OCCUPATIONAL EXPOSURE

FRICTION:
1960's Pontiac – Decedent purchased this car when he was 18 at dealership in Beulah, Michigan. Decedent owned this car for two years. The car had over 100,000 miles. Decedent replaced the brakes outside when he first bought the car. Decedent changed all four drum brakes. Decedent's brother Jimmy Stanton taught him how to change the brakes. To decedent, the brakes removed looked original. Decedent used an air compressor to blow out the brake dust. Decedent purchased the replacement brakes at an auto shop, off Route 115 in Beulah, Michigan. Decedent helped his brother, Jimmy Stanton, deceased, change the manifold, head cover and thermostat gasket. Decedent helped his brother change the whole exhaust system.

1955 MERCURY MERCAMATIC – Decedent purchased this car used with about 75,000 miles on it from a dealership on Route 115 Bealuh, Michigan. Decedent owned this car for a couple of years. When he was 20 years old, decedent replaced all four brakes and assisted in changing the thermostat gasket. Decedent blew out the brake dust with an air compressor. Decedent purchased the replacement brakes from American Discount Auto Parts.

1962 Buick La Sabre – Decedent purchased this car used in 1965 with about 60,000 miles, at SMILEY BUICK, Marland, Massachusetts. Decedent owned this car until 1969-1971. Decedent replaced the brakes on this car twice. Decedent did the first brake job in 1965. Decedent replaced all four drum brakes. Decedent performed this job outside of his mother-in-law's house in Revere, Massachusetts. Decedent cleaned out the wheel assembly with an air compressor. Decedent purchased replacement brakes from an auto parts store in Bell Circle, Revere, Massachusetts. Decedent purchased BENDIX (HONEYWELL INTERNATIONAL, INC.) replacement brakes. Decedent performed the second brake job, removing front brakes that he previously installed, around 1971. Decedent's wife watched. Decedent did this inside his garage of his home, 120 Errol Rd., Brockton, Massachusetts. Decedent blew out the brake dust with an air compressor. Decedent recalled having to sand the BENDIX (HONEYWELL INTERNATIONAL, INC.) replacement brakes before installing them to make them fit. Decedent changed the thermostat gasket after he bought the car.

1971 FORD PINTO: Decedent purchased it brand new from a FORD DEALERSHIP, Lynn Way, Massachusetts. Decedent owned this car for six to seven years. Decedent did two brake

1  jobs.  In 1974, decedent replaced all four brakes, drum on the back, disc on the front.  Decedent
did this inside the garage of his home because it was sprinkling.  Decedent removed the original
2  brakes.  Decedent used an air compressor to clean out the brake dust.  Decedent installed
BENDIX replacement brakes.  Decedent performed the second brake job around 1975.  Decedent
3  replaced the BENDIX front disc brake he had previously installed, inside the garage.  Decedent
blew out the brake dust with an air compressor.  Decedent recalled having to sand the BENDIX
4  replacement brakes before installing them to make them fit.   Plaintiff currently contends
decedent was exposed to asbestos during these automotive repairs.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR SURVIVAL, WRONGFUL DEATH - ASBESTOS; DEMAND FOR JURY TRIAL